IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RUSSELL JONES,

            Petitioner,               No. 2:10-cv-0895 KJN P

     vs.

JACQUEZ, Warden,                 ORDER AND

            Respondent.        FINDINGS AND RECOMMENDATIONS

_____/

I.  Introduction

        Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction on charges of first degree murder.  Petitioner was sentenced to life in state prison without the possibility of parole.  Petitioner claims that the trial court erred when it denied petitioner's Wheeler-Batson[1] motion.  After careful review of the record, this court concludes that the petition should be denied.

////

---

[1] Petitioner refers to the following cases concerning peremptory challenges of prospective jurors:  People v. Wheeler, 22 Cal.3d 258 (1978); and Batson v. Kentucky, 476 U.S. 79 (1986).

1

II.  Procedural History

On December 6, 2007, a jury convicted petitioner of first degree murder and found true special circumstance allegations that the murder was committed within the course of a robbery and a burglary.  (Clerk's Transcript ("CT") at 336.)  The trial court found petitioner sustained two prior strike convictions.  (CT 102-03.)

Petitioner filed a timely appeal, and the California Court of Appeal, Third Appellate District, affirmed the judgment on May 4, 2009.  (Respondent's Lodged Document ("LD") 8.)  Petitioner filed a petition for review in the California Supreme Court, which was denied without comment on July 8, 2009.  (LD 9-10.)

The instant petition was filed on April 14, 2010.  (Dkt. No. 1.)

III.  Facts

The facts of the underlying crimes are not at issue here.

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

////

2

1          Under section 2254(d)(1), a state court decision is "contrary to" clearly

2   established United States Supreme Court precedents if it applies a rule that contradicts the

3   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

5   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

6   (2000)).

7          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

8   habeas court may grant the writ if the state court identifies the correct governing legal principle

9   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11  simply because that court concludes in its independent judgment that the relevant state-court

12  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

14  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

16  omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

17  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

18  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

19         The court looks to the last reasoned state court decision as the basis for the state

20  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

21  decision, "and the state court has denied relief, it may be presumed that the state court

22  adjudicated the claim on the merits in the absence of any indication or state-law procedural

23  principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

24  overcome by a showing that "there is reason to think some other explanation for the state court's

25  decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

26  ////

1    Where the state court reaches a decision on the merits but provides no reasoning

2    to support its conclusion, the federal court conducts an independent review of the record.

3    "Independent review of the record is not de novo review of the constitutional issue, but rather,

4    the only method by which we can determine whether a silent state court decision is objectively

5    unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

6    decision is available, the habeas petitioner has the burden of "showing there was no reasonable

7    basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

8    determine what arguments or theories supported or, . . . could have supported, the state court's

9    decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10   arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

11   786.

12   V.  Batson Claim

13   Petitioner contends the court erred in finding that no prima facie case of racial

14   discrimination during jury selection had been established.  Petitioner, who is African-American,

15   claims that exclusion of the two African-American jurors deprived him of an impartial jury

16   chosen on a race-neutral basis, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

17   Petitioner contends the reasons for the peremptory challenges were pretextual.  Respondent

18   counters that the state court's decision was not based on an unreasonable determination of the

19   facts, and the record demonstrates valid, race-neutral reasons why the prosecutor excused

20   prospective jurors H.T. and D.Y.[2]

21   A.  Proceedings in the Trial Court

22   During voir dire, the court asked prospective Juror H.T. about her employment

23   with the Sacramento Housing and Redevelopment Agency.  (Augmented Reporter's Transcript

24

25   [2] While the surnames of the jurors are identified in the state court transcript, this court
     refers to jurors by the initial letters of their surnames in both the text and in quotations to the
26   state court record.

("ART") 54.)  Defense counsel asked H.T. about the questionnaire:

> MR. WHISENAND:  Ms. [H.T.], there was a section in your questionnaire where you mentioned a situation involving your brother.  Did you feel that he was treated fairly by the criminal justice system, by law enforcement and the court?
>
> [H.T.]:  I was very young at that time and really don't recall a lot of the trial or any of that part.  So --
>
> MR. WHISENAND:  Anything that you've heard since or felt since that might make it difficult for you to be fair to either side in a criminal case that you might sit as a juror on now?
>
> [H.T.]:  No, I don't think it will.
>
> MR. WHISENAND:  Okay, thank you.

(ART 68.)  The prosecutor asked the prospective jurors to think about whether they had any bad experiences with law enforcement.

> MR. STERN:  [H.T.], anything that you can think of, bad experiences, something you've watched on t.v., perhaps a case that you followed where you thought the judicial system did not work appropriately, maybe you saw Judge Judy and she scares the heck out of you, whatever experience you have had that has given you an opinion, good or bad, about our system of justice.  Anything that pops into your head?
>
> [H.T.]:  No.

(ART 74.)  The prosecutor then inquired whether any potential juror would have a problem with the concept of felony murder, that is, the situation where a person can be found guilty of first degree murder when committing a robbery, even if there was no intent to kill.

> MR. STERN:  And that's the law.  [H.T.], are you okay with that?
>
> [H.T.]:  Yes.

(ART 79.)  One potential juror was excused for cause, and both the prosecutor and defense counsel passed for cause.  (ART 92.)  During peremptory challenges, the prosecutor used his second peremptory challenge to excuse H.T.  (ART 93.)  More prospective jurors were added to the jury box.  (ART 101.)  The court asked prospective juror D.Y. about her current employment with Sacramento Housing, and D.Y. stated she previously worked at AT&T Wireless.  (ART

122-23.)  After other prospective jurors were questioned, the prosecutor turned to prospective

juror D.Y.

>           MR. STERN:  Ms. [D.Y.], any bad experiences with police
>           officers?
>
>           [D.Y.]:  Not really.
>
>           MR. STERN:  Not really, but not maybe.  Is there something there
>           you are thinking I don't want to talk about it?
>
>           [D.Y.]:  I just had one experience, but I'm not really sure what the
>           protocol is.  There was a man riding around in my area that said his
>           car [sic] had been stolen, and I had a car in front of my house with
>           the car cover.  And after he circled around, then he went back
>           home and got the police and came back, and I didn't think that was
>           appropriate because the car covers are all the same color, and I
>           didn't think I needed to prove myself, but I did have the box in the
>           back seat of my car.
>
>           MR. STERN:  The man who you said circled your car, was that a
>           civilian or police officer?
>
>           [D.Y.]:  Civilian.
>
>           MR. STERN:  It sounds like, at least to me, your quarrel was more
>           with the civilian than with the police.
>
>           [D.Y.]:  I didn't think that the police officer would bring him back
>           over there unless he knew in fact that was his car cover.  And of
>           course, all the ones I have seen are the same color, so how would
>           that be proven if I didn't have the box in there.
>
>           MR. STERN:  But you don't really know what the man told the
>           police officer?
>
>           [D.Y.]:  No, I don't, but then he gave me the wrong badge number.
>
>           MR. STERN:  Do you think he was trying to deceive you?
>
>           [D.Y.]:  I don't know what he was trying to do.  He told me the
>           wrong badge number and I wrote the badge number down.  I saw
>           it.
>
>           MR. STERN:  Did that happen here in Sacramento?
>
>           [D.Y.]:  Elk Grove.
>
>           MR. STERN:  How long ago?

1    [D.Y.]:  Year and a half.

2    MR. STERN:  Did you report what you felt was inappropriate
     police conduct to the Elk Grove Police Department?
3

4    [D.Y.]:  No, I just wrote the badge number down and kept it.

5    MR. STERN:  As you sit here today, does that still bother you a little bit?

6    [D.Y.]:  No, not in my judgment, no.

7    MR. STERN:  Do you think the officer acted inappropriately?

8    [D.Y.]:  I guess not to the other guy, but I don't feel that they both
     should have come back to my house, no.  If he wanted to
     investigate, I think he should have come back alone.
9

10   MR. STERN:  Do you think there was a racial motivation in the
     officer coming back to your house?

11   [D.Y.]:  I doubt it because he was black, too.

12   MR. STERN:  So it was conduct that you felt was perhaps
     unprofessional by the officer, but not racially motivated in any
13   way?

14   [D.Y.]:  Huh-uh.

15   MR. STERN:  Okay.  And as you sit here today, you would not
     allow that incident to affect your ability to sit as a juror in this
16   case?

17   [D.Y.]:  No.

18   MR. STERN:  You okay with everything?

19   [D.Y.]:  (Nodding.)

20   MR. STERN:  Do you watch any of the CSI shows?

21   [D.Y.]:  Not CSI.

22   MR. STERN:  Which one do you watch?

23   [D.Y.]:  First 48.

24   MR. STERN:  First 48?  I don't know that one.

25   [D.Y.]:  It is live on the scene.

26   ////

1    MR. STERN:  And they sometimes do this same kind of a thing,
     they are going to crime scenes and following how the case is
2    investigated?

3    [D.Y.]:  They have forty-eight hours to see how much they can
     come up with.

4

5    (ART 132-34.)  The prosecutor then turned to other prospective jurors.  Later, the prosecutor

6    asked the panel about their duties as jurors.  (ART 136.)

7    MR. STERN:  Ms. [D.Y.], you recognize that's your job here, if
     possible, to reach a verdict, right?

8
     [D.Y.]:  Yes.
9
     MR. STERN:  And that may mean it's possible your first vote in
10   this case, if you were on the jury, could be six-six, and the
     tendency of folks is to throw their hands up and say six-six, we are
11   never going to reach a verdict.  But do you recognize if people are
     willing to talk through the facts and discuss the case and be
12   respectful of each other's opinions, you can move from six-six and
     ultimately be unanimous if appropriate?
13
     [D.Y.]:  (Nodding.)
14
     MR. STERN:  You are willing to take the time and effort even if it
15   does get close to Christmas to do that?

16   [D.Y.]:  Yes.

17   (ART 136-37.)  Both sides passed for cause, and the prosecutor used his twelfth peremptory

18   challenge to excuse prospective juror D.Y.  (ART 140.)  At that point, defense counsel requested

19   a sidebar, the jury was excused, and defense counsel made a *Batson/Wheeler* motion.  (Id.)

20   MR. WHISENAND:  I am going to object and pose a motion to the
     composition of the current panel on racial grounds as the
21   prosecutor has now discharged the two African-American jurors
     who have made it into the jury box, both women, neither of whom
22   had obvious personal problems.

23    Ms. [H.T.] did have a brother who had been – who had been
     convicted of manslaughter, but none of her answers suggested a
24   problem with the legal processes or law enforcement.

25    Ms. [D.Y.'s] questionnaire reflected positive experience with the
     Elk Grove Police Department just by the fact she did give one
26   balancing negative experience with the Elk Grove Police

8

1    Department.

2    They are the two individuals of African-American [descent] by
     sight and self-identification through the questionnaire that have
3    made it into the jury box.

4    THE COURT:  Mr. Stern, I am not requiring that you make any
     further statement at this point.  If you'd like, I'll – but I will hear
5    from you if you would like to discuss the issue of prima facie case
     based on the state of the record.

6

7    (ART 140-41.)  The prosecutor asked the court to have the questionnaires of Ms. [H.T.] and Ms.

8    [D.Y.] marked as exhibits, and the court agreed.

9    MR. STERN:  On Ms. [H.T.'s] questionnaire, she indicates that
     her brother was in prison for manslaughter.  Her son was in jail for
10   a 10851, and I believe on page sixteen of her questionnaire, she
     says that she thinks blacks do more time than whites do for the
11   same crime.

12   As to Ms. [D.Y.'s] questionnaire, she indicates that she has a
     cousin who was convicted of manslaughter about twelve years ago.

13

        . . .

14

15   MR. STERN:   [Ms. D.Y.] has a cousin who was convicted of
     manslaughter in 1995, and also during the questioning, of course, I
16   asked her about bad experiences.  She didn't want to detail any bad
     experiences, but I could tell by her expression she did, and I think
17   the Court noticed that also.

18   And I would ask the Court to agree with me on the record that
     she appeared emotional when I wanted to question her about it and
19   appeared to me to not want to talk about it.  And it is an incident
     that she did not list in her questionnaire, even though there were
20   pointed questions about a bad experience with police officers.

21   So I think  Ms. [D.Y.] was demonstrating she was prepared to be
     deceitful in order to get on this jury, which I think gives me ample
22   reason to want to use a peremptory challenge.

23   (ART 141-42.)  The court asked the prosecutor if there was anything else he wanted to say about

24   the evidence, and the prosecutor declined.  (ART 142.)  The court turned to defense counsel:

25   THE COURT:  Anything else, Mr. Whisenand?

26   MR. WHISENAND:  When I talked to Ms. [H.T.] about her

9

1   brother's situation, as I remember it, she indicated that she felt the
    legal processes worked.  He is the one who did the fifteen years for
2   manslaughter.  And then on her questionnaire she described that
    her son served six months in jail for a stolen car, and indicates that
3   my son done wrong and had to serve time on her questionnaire.

4       So I think Ms. [H.T.] also gave a very balanced and honest view
    of her experience with law enforcement and the criminal justice
5   system, just as Ms. [D.Y.] did when she remembered.  I disagree
    with the characterization Ms. [D.Y.] looked like she was trying to
6   not say what she actually said.

7   THE COURT:  What do you make of the comment by Ms. [H.T.]
    on the questionnaire, according to Mr. Stern, that blacks do more
8   time?

9   MR. WHISENAND:   She said people of color was her language,
    tend to – she said I do not follow a lot of cases, that's kind of her
10  prefatory statement.

11      I'm sorry, your Honor, I had it a moment ago.

12  MR. STERN:  The quote is, "I have not followed a lot of cases, but
    there does appear that people of color do end up serving a lot more
13  time than other groups do for the same crimes.

14  THE COURT: Okay.  [¶]  All right.  Anything else with respect to
    the issue of prima facie showing from either side?
15

16  (ART 142-43.)  Both sides declined further comment.

17  THE COURT:  Okay.  I'm looking at and I will read from what I
    believe is the standard that I'm guided by.  It is <u>Johnson [v.]</u>
18  <u>California</u>.  This is a United States Supreme Court case 125
    Supreme Court 2410, and I'll read from their language.  In that
19  case, as you know, they rejected the California standard and
    created a new standard of a finding under *Batson/Wheeler*.
20

21      The <u>Batson</u> court held that a prima facie case can be made out by
    offering a wide variety of evidence so long as the sum of the
22  proffered evidence, quote "gives rise to an inference of
    discriminatory purpose."  And then it cites several factors, and the
23  Court is to look at other relevant circumstances which raise an
    inference that the prosecutor excluded venire members on account
    of race.

24  ////

25  ////

26  ////

Mr. Stern has used, I believe, eleven[3] challenges to this point. He has used two of those challenges against obviously African-American females. Let me make a comment about both of them and then I will come to my ruling about whether a prima facie case has been made.

It is impossible for the Court to – I believe there's case law which says there is no magic number. Exclusion of one African-American juror or one juror in a protected class can be enough. So there is no magic number, and so that does not help me. I will make a comment with regard to Mr. Stern's comment with respect to his second challenge to juror [D.Y.].

She did appear to be – to me to be not forthcoming. I would not conclude necessarily that she was trying to deceive Mr. Stern or deceive the Court, but it was clear in my observation she was not particularly forthcoming. And I understand this is information that came out just during voir dire that was not placed upon her questionnaire.

The description of the event is somewhat [murky] to me and unclear. I could not gather in total what she was talking about, but there appeared to be an event, a recent event in Elk Grove that involved a police officer that she seemed to be confused by and could not tell whether an officer in that case was up to no good or not. I do not know whether she has concluded one way or another he was up to no good, but certainly something happened there which was bothering her.

And again, I think I need to, and I can take into consideration the totality of circumstances that are before me, whether I find a prima facie case, so this is hard because I don't want to get over into the area of finding a prima facie case and then resolving the question, but I want to say that with respect to the comment on Ms. [H.T.'s] questionnaire, that quote, people of color seem to get a lot more time than other people, I would say that comment by a juror would be very concerning, and appropriately so, in addition to someone whose son has done jail time and a brother who is in prison for a manslaughter.

Again, the number is not determinative. I would say on the totality of the facts, at this point there is not a prima facie case to suggest improper use of peremptory challenges by the prosecutor. On the record that I have before me and based on what I know, based on what has been presented, it appears to the Court that the

---

[3] The trial judge thought the prosecution had exercised eleven challenges, but after the <u>Batson</u> motion was denied, and jury selection began again, the clerk clarified, and Mr. Stern concurred, that the prosecution had exercised twelve peremptory challenges. (ART 146.)

use of peremptory challenges has been appropriate.  They have not been used for purposeful discrimination.

Therefore I would find there is no prima facie case and I would deny the motion on that ground.

(ART 143-44.)

B.  Court of Appeal Decision

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

[Petitioner] contends the trial court erred when it denied his *Wheeler-Batson* motion.  He claims the ruling deprived him of his federal and state rights to a jury selected according to non-discriminatory criteria.  We disagree.

During jury voir dire, the prosecutor exercised his second peremptory challenge against H.T. and his twelfth peremptory challenge against D.Y.  After the latter challenge, defense counsel made a *Wheeler-Batson* motion, arguing that by challenging H.T. and D.Y., the prosecutor had dismissed "the two African-American jurors who [had] made it into the jury box."  [Petitioner] is African-American.

The trial court stated it was not requiring any explanation from the prosecutor but asked the prosecutor whether he wanted to discuss "the issue of prima facie case based on the state of the record."

The prosecutor explained that H.T., in her questionnaire, had said that her brother had been in prison for manslaughter, her son had been in jail for unlawful driving or taking of a vehicle, and she believed African-Americans serve more time than whites do "for the same crimes."

The prosecutor explained that D.Y. had a cousin who had been convicted of manslaughter in 1995.  The prosecutor further explained that when he asked D.Y. about bad experiences with police, she did not want to detail any such experiences, but her expression indicated that she had had them.  Also, she had appeared emotional when the prosecutor wanted to ask her about these experiences, and it appeared she did not want to talk about them.

Parenthetically, we note that the prosecutor asked the trial court to "agree with [him] on the record" that D.Y. had appeared to be

emotional.  On appeal, [petitioner] suggests the prosecutor had done so because he was "[a]pparently aware of Snyder v. Louisiana (2008) 552 U.S. 472 [170 L.Ed.2d 175]."  We note that the *Wheeler-Batson* motion was heard on November 7, 2007, and Snyder was decided months later, on March 19, 2008.

   In any event, the prosecutor added that, during questioning, D.Y. discussed an incident that she had not reported in her questionnaire, even though the questionnaire contained "pointed questions" about bad experiences with police officers.  Based on this, the prosecutor believed that D.Y. was prepared to be deceitful in order to serve on this jury.

   Defense counsel countered that H.T. had expressed her belief that the legal processes worked.  He noted that, on her questionnaire, H.T. had expressed her belief that her son had "done wrong and had to serve time."  Defense counsel disagreed with the prosecutor's assertion that D.Y. "looked like she was trying to not say what she actually said."

   Quoting Johnson v. California (2005) 545 U.S. 162 [162 L.Ed.2d 129], the trial court noted that a prima facie case of discrimination is shown where the proffered evidence "gives rise to an inference of discriminatory purpose."

   The trial court found no prima facie case of discrimination. It noted that the prosecutor had used two of his 12 challenges against African-American women.  The court observed that D.Y. "was not particularly forthcoming," and that during voir dire, she had described an encounter with police that "was bothering her," although her description of the event was "somewhat murky" and "unclear."  The court noted that H.T.'s comment that "people of color seem to get a lot more time than other people" "would be very concerning, and appropriately so"; moreover, H.T.'s son had served time in jail and her brother had served time in prison for manslaughter.

   "Both the state and federal Constitutions prohibit the use of peremptory challenges to exclude prospective jurors based on race or gender.  [Citations.]  Such a use of peremptories by the prosecution 'violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.  [Citations.]  Such a practice also violates the [petitioner's] right to equal protection under the Fourteenth Amendment to the United States Constitution.'  [Citation.]

   "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.  [Citations.]  To do so, a defendant must first 'make out a prima facie case "by

13

showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial . . . exclusion" by offering permissible race-neutral . . . justifications for the strikes. [Citations.]  Third, "[i]f a race-neutral . . . explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination." [Citation.]' [Citation.]  The same three-step procedure applies to state constitutional claims.  [Citation.]"  (People v. Bonilla (2007) 41 Cal.4th 313, 341 (Bonilla).)

"When the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied.  [Citations.]  Under such circumstances, we sustain the trial court if, upon independently reviewing the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose. [Citation.]"  (People v. Howard (2008) 42 Cal.4th 1000, 1018.)

As in Bonilla, [petitioner] relies "on the fact that all African-Americans -- two of two -- were struck from the juror pool.  It is true the prosecution used peremptories to challenge both African-Americans in the pool, but 'the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible.  "[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion."' [Citations.]" (Bonilla, supra, 41 Cal.4th at pp. 342-343; accord People v. Howard, supra, 42 Cal.4th at p. 1018, fn. 10 ["The challenge of one or two jurors, standing alone, can rarely suggest a pattern of impermissible exclusion"].)  The small size of the sample distinguishes [petitioner's] principal authority, Miller-El v. Dretke (2005) 545 U.S. 231 [162 L.Ed.2d 196], in which the 10 black jurors were removed by peremptory challenge.  (Id. at pp. 240-241.)

[Petitioner] claims Bonilla was wrongly decided.  The argument must be directed to a court higher than this one.  (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)  But, we note, [petitioner] misreads Bonilla:  it does not suggest that, "if you remove the only two African-Americans you have, the surrounding facts and circumstances do not support an inference of discriminatory purpose."  (Italics added.)  Rather, Bonilla holds that "drawing an inference of discrimination from [the removal] alone " is "impossible"; it is the surrounding facts and circumstances that will, or will not, support an inference of discrimination in a particular case.

Here, as in <u>Bonilla</u>, "the information elicited in voir dire showed race-neutral reasons for excusing both prospective jurors." (<u>Bonilla</u>, <u>supra</u>, 41 Cal.4th at p. 343.)  As the prosecutor noted, H.T. had a brother who had served a prison term for manslaughter and a son who had served a jail sentence for unlawful driving or taking of a vehicle.  H.T. was similar to the dismissed prospective juror in <u>Bonilla</u> whose father had been convicted of homicide and whose husband had been convicted of a felony.  (<u>Ibid.</u>)

[Petitioner] counters that having a close relative in prison is not a race-neutral reason for a peremptory challenge because more "persons of color" have relatives in prison than do Caucasians.  But <u>Bonilla's</u> identification of the factor as race-neutral is binding on this court.  (<u>Auto Equity Sales, Inc. v. Superior Court</u>, <u>supra</u>, 57 Cal.2d at p. 455.)

Besides having close relatives who had been convicted of crimes, H.T. opined that "people of color" serve "a lot more time" than others "for the same crimes."  A juror's assertion that the justice system discriminates against certain groups is a valid, race-neutral basis for a peremptory challenge.  (<u>People v. Cornwell</u> (2005) 37 Cal.4th 50, 69-70; <u>People v. Walker</u> (1988) 47 Cal.3d 605, 625-626.)

We note that [petitioner] filed a motion asking this court to take judicial notice of the number of persons of color incarcerated in state prison and the number of persons of color in the State of California.  We denied the motion because the material had not been presented to, and considered by, the trial court in the first instance.  (<u>People v. Preslie</u> (1977) 70 Cal.App.3d 486, 493.)

In <u>People v. Lenix</u> (2008) 44 Cal.4th 602, our Supreme Court recently held that, in appropriate circumstances, "comparative juror analysis must be performed on appeal even when such an analysis was not conducted below."  (<u>Id.</u> at p. 607.)

Following <u>Lenix</u>, [petitioner] renewed his motion, arguing the material is necessary to a comparative juror analysis.  However, <u>Lenix</u> explains that comparative juror analysis will be undertaken for the first time on appeal when "reviewing claims of error at *Wheeler/Batson's* third stage."  (<u>Ibid.</u>)  Here, in contrast, [petitioner] is asserting error at *Wheeler/Batson's* first stage, which <u>Lenix</u> expressly "does not implicate."  (<u>Id.</u> at p. 622, fn. 15; <u>see</u> <u>Bonilla</u>, <u>supra</u>, 41 Cal.4th at pp. 343, 350 [comparative analysis not required in first stage case, even though prosecutor stated reasons for the record].)  [Petitioner's] motion for judicial notice is denied.

Relying largely on information outside the appellate record, [petitioner] claims the challenge to H.T. was improper because her assertion about the justice system was correct.  But the prosecutor was entitled to challenge H.T. for any reason including her beliefs

15

about the justice system, whether correct or not, so long as the reason was not based upon group bias, i.e., H.T.'s membership in a particular group.  (<u>People v. Gutierrez</u> (2002) 28 Cal.4th 1083, 1122.)

Like H.T., prospective juror D.Y. had a relative who had been convicted of a serious crime: her cousin had been convicted of manslaughter.  This was a race-neutral reason for a peremptory challenge.  (<u>People v. Barber</u> (1988) 200 Cal.App.3d 378 [prospective juror's first cousin had served prison sentence and was awaiting trial on new charges].)

Furthermore, during voir dire, D.Y. described an unpleasant encounter with police.  She had omitted the incident from her questionnaire, which had inquired about "memorably good or bad experience with a law enforcement officer," even though she had written about a separate "good experience."  It appeared to the prosecutor that D.Y. did not want to talk about the matter.  The trial court agreed that she appeared "to be not forthcoming."  A prior negative experience with law enforcement constitutes a valid, race-neutral reason for a peremptory challenge.  (<u>People v. Gutierrez</u>, <u>supra</u>, 28 Cal.4th at p. 1125; <u>People v. Turner</u> (1994) 8 Cal.4th 137, 171.)  So does the fact that a candidate is withholding relevant information in voir dire (or in a questionnaire).  (<u>People v. Adanandus</u> (2007) 157 Cal.App.4th 496, 509.)

Here, D.Y.'s encounter with police and her failure to reveal it on her questionnaire each constituted a valid, race-neutral reason upon which the prosecutor could challenge her.  That is so regardless of whether D.Y., with her experience as a housing eligibility evaluator, had good cause to question the police conduct in the prior incident.

[Petitioner] claims the trial court's finding that D.Y. was not forthcoming is "not accurate" and "not based on facts in the record."  We disagree.  As [petitioner] concedes, the record shows that D.Y. was "hesitant to criticize the officer's investigatory tactics if he was, in fact, following correct procedure."  But even if correct, that procedure evidently had resulted in a "memorably . . . bad experience" that should have been revealed on the questionnaire.  The fact that it was not revealed supports a finding that D.Y. had not been forthcoming.

The prosecutor asked D.Y., "As you sit here today, does that still bother you a little bit?"  D.Y. answered, "No, not in my judgment, no."  Shortly thereafter, the trial court remarked that "something happened there which *was* bothering her."  (Italics added.) [Petitioner] claims the trial court's "failure to listen accurately to" D.Y. is "troubling."  But the court did not purport to find that the incident "was bothering" D.Y. on the date of the *Wheeler-Batson* motion, which she denied, rather than at or near the time of the

1    incident.  No error or inconsistency appears.

2         [Petitioner] claims the trial court erred by failing to question
     D.Y. about the incident to clarify the portions of her remarks that it
3    had found to be "somewhat murky" and "unclear."  However, the
     court found with certainty that something related to law
4    enforcement, which had been bothering her but had not been
     disclosed on her questionnaire, had happened.  [Petitioner] does
5    not contend the court's certainty would have evaporated had other
     aspects of the incident been clarified.  Thus, even if there was
6    error, no prejudice appears on this record.

7         [Petitioner] lastly argues his claim is supported by comparative
     juror analysis.  However, as we have explained, we do not
8    undertake that analysis for the first time on appeal in a first stage
     *Wheeler-Batson* case.  (See, ante, at p. 8.)

9

10   (LD 8 at 2-11.)

11          C.  Batson Standards

12          Purposeful discrimination on the basis of race or gender in the exercise of

13   peremptory challenges violates the Equal Protection Clause of the United States Constitution.

14   See Batson, 476 U.S. at 79; Johnson v. California, 545 U.S. 162 (2005).  Batson claims are

15   evaluated pursuant to a three-step test:

16          First, the movant must make a prima facie showing that the
            prosecution has engaged in the discriminatory use of a peremptory
17          challenge by demonstrating that the circumstances raise "an
            inference that the prosecutor used [the challenge] to exclude
18          veniremen from the petit jury on account of their race."  Second, if
            the trial court determines a prima facie case has been established,
19          the burden shifts to the prosecution to articulate a [gender]-neutral
            explanation for challenging the juror in question.  Third, if the
20          prosecution provides such an explanation, the trial court must then
            rule whether the movant has carried his or her burden of proving
21          the existence of purposeful discrimination.

22   Tolbert v. Page, 182 F.3d 677, 680 (9th Cir. 1999) (en banc) (internal citations omitted).

23          In order to establish a prima facie case of racial discrimination, petitioner must

24   show that "(1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor

25   used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

26   inference that the strike was motived by race."  Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir.

                                           17

1  2006) (citing Batson, 476 U.S. at 96, and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th

2  Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

3  evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

4  purpose.'" Johnson, 545 U.S. at 169 (quoting Batson, 476 U.S. at 94.)  In evaluating whether a

5  defendant has established a prima facie case, a reviewing court should consider the "'totality of

6  the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike."  Boyd,

7  467 F.3d at 1146 (quoting Batson, 476 U.S. at 94, 96).  This evaluation should include a review

8  of the entire transcript of jury voir dire in order to conduct a comparative analysis of the jurors

9  who were stricken and the jurors who were allowed to remain.  Boyd, 467 F.3d at 1050 ("We

10 believe, however, that Supreme Court precedent requires a comparative juror analysis even when

11 the trial court has concluded that the defendant failed to make a prima facie case"); see also

12 Miller-El v. Dretke, 545 U.S. 231 (2005) (utilizing comparative analysis, in a case in which a

13 prima facie showing had been made, to determine whether the prosecutor had been motived by

14 racial bias in exercising peremptory challenges).

15         At the second step of the Batson analysis, "'the issue is the facial validity of the

16 prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360 (1991).  "A neutral

17 explanation in the context of our analysis here means an explanation based on something other

18 than the race of the juror."  Id. at 360.  "Unless a discriminatory intent is inherent in the

19 prosecutor's explanation, the reason offered will be deemed race-neutral."  Stubbs v. Gomez, 189

20 F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360).  For purposes of step two,

21 the prosecutor's explanation need not be "persuasive, or even plausible."  Purkett v. Elem, 514

22 U.S. 765, 768 (1995).  Indeed, "[t]o accept a prosecutor's stated nonracial reasons, the court need

23 not agree with them."  Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006).  "It is not until the

24 third step that the persuasiveness of the justification becomes relevant--the step in which the trial

25 court determines whether the opponent of the strike has carried his burden of proving purposeful

26 discrimination."  Purkett, 514 U.S. at 768 (emphasis in original).  The question is whether, after

18

1    an evaluation of the record pertaining to that particular case, the prosecutor's race-neutral

2    explanation for a peremptory challenge should be believed.  Id.

3          In the third step of a Batson challenge, the trial court has "the duty to determine

4    whether the defendant has established purposeful discrimination," Batson, 476 U.S. at 98, and, to

5    that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  See Purkett,

6    514 U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court

7    has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct

8    evidence of intent as may be available.'"  Batson, 476 U.S. at 93 (quoting Arlington Heights v.

9    Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363.

10   "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

11   purposeful discrimination."  Purkett, 514 U.S. at 768; see also Lewis v. Lewis, 321 F.3d 824,

12   830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or

13   many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.")

14   In step three, the court "considers all the evidence to determine whether the actual reason for the

15   strike violated the defendant's equal protection rights."  Yee v. Duncan, 463 F.3d 893, 899 (9th

16   Cir. 2006).  A reviewing court must evaluate the "totality of the relevant facts" to decide

17   "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Ali

18   v. Hickman, 584 F.3d 1174, 1180 (9th Cir. 2009).  "A court need not find all nonracial reasons

19   pretextual in order to find racial discrimination."  Kesser, 465 F.3d at 360.

20         Petitioner bears the burden of persuasion to prove the existence of unlawful

21   discrimination.  Batson, 476 U.S. at 93.  This "ultimate burden of persuasion . . . rests with, and

22   never shifts from, the opponent of the strike."  Purkett, 514 U.S. at 768.  However, "the

23   defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory

24   challenges constitute a jury selection practice that permits 'those to discriminate who are of a

25   mind to discriminate.'"  Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562

26   (1953)).

D. <u>Analysis</u>

Both potential jurors H.T. and D.Y. were members of a "cognizable racial group" and the prosecutor used peremptory strikes and later articulated reasons to remove them, thereby satisfying the first two prongs of the analysis with respect to the establishment of a prima facie case of racial discrimination.  However, as set forth more fully below, the totality of the circumstances do not raise an inference that the strikes were motived by race.

The reasons articulated by the prosecutor are facially valid.  Potential juror H.T.'s brother was convicted of manslaughter, and her son served time in jail.  Having a relative who sustained a criminal conviction is a race-neutral reason for exercising a peremptory challenge. <u>United States v. Vaccaro</u>, 816 F.2d 443, 457 (9th Cir. 1987) (fact that juror is related to a convicted criminal is race-neutral reason for exercising peremptory challenge), <u>overruled on other grounds</u> by <u>Huddleston v. United States</u>, 485 U.S. 681 (1998).  But another compelling reason for excusing H.T. was her statement on the jury questionnaire:

> I have not followed a lot of cases but there does appear that people of color do end up serving a lot more time than other groups do for the same crimes.

(Clerk's Augmented Transcript at 36.)  Distrust of the criminal system "is significant because a juror's skepticism of the criminal justice system may give rise to substantial bias." <u>Martinez v. Yates</u>, 2011 WL 672651 (N.D. Cal. Feb. 16, 2011).  This potential bias can exist in any one, without regard to one's ethnicity.  Therefore, this reason was also race-neutral.

With regard to potential juror D.Y., the state court found D.Y. had a cousin who was convicted of a serious crime, manslaughter, which is a race-neutral reason for a peremptory challenge.  Also, D.Y. had an unpleasant experience with an Elk Grove police officer during which she asked for the officer's badge number.  It is well settled that a previous negative experience with law enforcement or the judicial system constitutes an acceptable, race-neutral explanation for striking a potential juror.  <u>See</u> <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1048 (9th Cir. 2004) (a negative experience with law enforcement is an acceptable, race-neutral explanation to

1    strike a potential juror).  In addition, petitioner's counsel on appeal conceded that the prosecutor

2    removed other prospective jurors  who had personal experiences with the justice system.  (LD 5

3    at 48.)  Moreover, the trial court concurred with the prosecutor's view of D.Y.'s demeanor and

4    reluctance in wanting to discuss her experience finding that she was not forthcoming with her

5    responses.  Federal courts generally defer to the state trial court's evaluation of whether the

6    prosecutor genuinely relied on a juror's demeanor in exercising a peremptory challenge.  Snyder

7    v. Louisiana, 552 U.S. 472, 479 (2008).  Finally, the contradiction of D.Y. failing to list on her

8    questionnaire her relatively recent experience with an Elk Grove police officer, yet raising it on

9    direct questioning during voir dire, also provides a race-neutral reason for the prosecutor's

10   challenge.

11          Thus, a review of the record does not indicate that any of the prosecutor's reasons

12   were pretextual.  Petitioner offered no evidence demonstrating that the race-neutral reasons

13   provided were pretextual.

14                        i.  Comparative Analysis

15          For the first time on appeal, petitioner argued that the court was required to

16   perform a comparative analysis of the jurors.  (LD 5 at 46.)  The Court of Appeal denied

17   petitioner's request, stating a comparative analysis was required only when evaluating the third

18   stage of a Batson claim, not at the first stage, where it is not implicated.[4]

19          However, a comparative juror analysis is an additional tool to evaluate the

20   plausibility of a prosecutor's stated reasons in light of all the evidence.  Miller-El v. Dretke, 545

21   U.S. 231 (2005); see also Kesser, 465 F.3d at 361 ("in Miller-El, the [Supreme] Court made clear

22   that the comparative analysis is required even when it was not requested or attempted in the state

23   court").  Although all the jury questionnaires were not provided as part of the record, the voir

24   dire transcript may provide a basis for the comparative analysis.  Miller-El, 545 U.S. at 241 n.2;

25

26          [4]  Appellate counsel did not raise the issue of comparative analysis in the petition for
     review filed in the California Supreme Court.  (LD 9.)

1    cf. Kesser, 465 F.3d at 261.

2            In his opening brief on appeal, petitioner argued that Juror No. 9's statement that

3    "our system of justice may be flawed but is as close as the best we can create," is comparable to

4    H.T.'s statement that people of color serve more time in prison, because both potential jurors

5    recognized our system is flawed, yet Juror No. 9 was permitted to remain on the jury. (LD 5 at

6    47.) However, Juror No. 9's statement was in response to the prosecutor's question (ART 75),

7    and H.T. was not asked this question on voir dire.  Moreover, Juror No. 9's response was general

8    and demonstrated a positive view of the system.  H.T.'s statement, made in her jury

9    questionnaire, was specific to people of color and demonstrated a negative view of the way

10   people of color are treated in our system.  As noted above, H.T.'s comment reflects a certain bias.

11   Juror No. 9's response does not reflect a similar bias.  Petitioner's argument that both statements

12   assert our criminal justice system is flawed understates H.T.'s response.  Moreover, it appears

13   that Juror No. 9 reported no close relatives had been convicted and sentenced for serious crimes,

14   whereas H.T. did.  Therefore, H.T. and Juror No. 9 were not similarly situated.

15           Likewise, petitioner's effort to compare jurors 1, 7, 8, and 10 with H.T. are

16   similarly unavailing because there is no indication that any of these jurors had close relatives

17   convicted of serious crimes, and none of them stated people of color are imprisoned longer than

18   other groups, so they, too, are not similarly situated to H.T.

19           Respondent points out that Juror No. 6 also had a family member convicted of a

20   crime; her husband was arrested for soliciting a prostitute.  (ART 113.)  However, arguably,

21   solicitation is not a serious crime, particularly when compared to manslaughter.  Moreover, Juror

22   No. 6 made no statements reflecting a bias against the justice system, had no family member

23   convicted of manslaughter, had no unpleasant experience with law enforcement, and no

24   contradiction between her voir dire responses and her jury questionnaire were noted in the

25   record.  Thus, Juror No. 6 was not similarly situated to H.T. or D.Y.  Ultimately, Juror No. 6 was

26   excused by defense counsel.  (ART 115.)

1    Therefore, the comparative analysis does not reflect differing treatment of

2  similarly situated prospective jurors.

3    ii.  <u>Statistical Argument</u>

4    Petitioner argues that the dismissal of the only two African-American prospective

5  jurors from the jury box reflects that 100% of the African-American persons were removed,

6  demonstrating a prima facie case of racial discrimination.

7    A prima facie case of discrimination may be based on statistical disparity.  <u>United

8  States v. Collins</u>, 551 F.3d 914, 921 (9th Cir. 2009) ("We have found an inference of

9  discrimination where the prosecution strikes a large number of panel members from the same

10 racial group, or where the prosecutor uses a disproportionate number of strikes against members

11 of a single racial group." (citation omitted).  Indeed, a single peremptory strike, if purposely

12 discriminative, is enough to upset a jury conviction.  <u>Batson</u>, 476 U.S. at 95-96.  However, a

13 prima facie showing based on statistical disparity may be dispelled by other relevant

14 circumstances during the voir dire process.  <u>Collins</u>, 551 F.3d at 921.  In addition, to make the

15 prima facie showing, the court considers the differing treatment of similarly situated prospective

16 jurors.  <u>Id.</u> at 921-22.

17    Here, petitioner's argument turns on very small numbers, and is insufficient,

18 without more, to establish a prima facie case because of the legitimate reasons supporting the

19 prosecutor's challenges to potential jurors H.T. and D.Y.  <u>See Fernandez v. Roe</u>, 286 F.3d 1073,

20 1078 (9th Cir. 2002) ("Two challenges out of two venirepersons are not always enough to

21 establish a prima facie case.").  In the instant case, the prosecution exercised 2 out of 12

22 peremptory challenges to dismiss H.T. and D.Y., which represents 17% of the prosecutor's total

23 challenges.  Because this percentage is small, and may be unreliable, reliance on the statistical

24 number, standing alone, is insufficient.  <u>Hargrove v. Pliler</u>, 2009 WL 1220768 (9th Cir. May 6,

25 2009).  As set forth above, the record reflects that the prosecutor's reasons for challenging H.T.

26 and D.Y. were race-neutral, and there was no differing treatment of similarly situated prospective

23

1  jurors.  Thus, there is no additional evidence to support petitioner's statistical argument.

2  Therefore, the record lacks any statistical disparity in light of the totality of the relevant

3  circumstances to raise an inference of discriminatory purpose.

4                     iii.  Conclusion

5           Petitioner has failed to carry his burden of proving the state court's determination

6  of this claim was unreasonable.  He has not shown the existence of unlawful discrimination with

7  respect to the prosecutor's challenges to H.T. or D.Y.  The prosecutor expressed reasonable bases

8  for his use of peremptory challenges against H.T. and D.Y., and those reasons are not

9  undermined by the record.  The trial court's determination that those reasons were credible is

10  entitled to "great deference."  Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011).  Both the trial

11  court and the Court of Appeal applied the proper standard of review required by Johnson v.

12  California, 545 U.S. at 162.  Both courts reasonably concluded that petitioner failed to

13  demonstrate a prima facie showing of discrimination.  Therefore, the California courts' rejection

14  of petitioner's claim is not contrary to, or an unreasonable application of the Batson standard, nor

15  based on an unreasonable determination of the facts in light of the evidence.  Accordingly, the

16  petition for writ of habeas corpus should be denied.

17  VI.  Request for Evidentiary Hearing

18           Petitioner failed to make a showing of success on the merits of this claim to

19  justify an evidentiary hearing.  See Cullen v. Pinholster, 131 S. Ct. 1388 (2011) ("evidence

20  introduced in federal court has no bearing on section 2254(d)(1) review").

21  VII.  Conclusion

22           In accordance with the above, IT IS HEREBY ORDERED that:

23           1.  The Clerk of the Court is directed to assign a district judge to this case; and

24           2.  Petitioner's request for an evidentiary hearing is denied.

25  ////

26  ////

1    IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

2    habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District

4    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

5    one days after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

8    objections, he shall also address whether a certificate of appealability should issue and, if so, why

9    and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

10   the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

11   § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

12   service of the objections.  The parties are advised that failure to file objections within the

13   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

14   F.2d 1153 (9th Cir. 1991).

15   DATED:  August 23, 2011

16

17                                                        _____

18                                                        KENDALL J. NEWMAN
                                                          UNITED STATES MAGISTRATE JUDGE

19   jone0895.157

20

21

22

23

24

25

26